Richard R. Patch (State Bar No. 88049)
Benjamin C. Pulliam (State Bar No. 294628)
COBLENTZ PATCH DUFFY & BASS LLP
1 Montgomery St, Suite 3000
San Francisco, California 94104
Telephone: (415) 772-5722
Facsimile: (415) 989-1663
Email: ef-rrp@cpdb.com
       ef-bcp@cpdb.com

Franklin D. Cordell (*Appearance Pro Hac Vice*)
Greg D. Pendleton (*Appearance Pro Hac Vice*)
GORDON TILDEN THOMAS & CORDELL LLP
600 University Street, Suite 2915
Seattle, Washington 98101
Telephone: (206) 467-6477
Facsimile: (206) 467-6292
Email: fcordell@gordontilden.com
       gpendleton@gordontilden.com

*Attorneys for Daniel Friedberg*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| SAMUEL BANKMAN-FRIED, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CONTINENTAL CASUALTY COMPANY,<br><br>Defendants. | CASE NO.  5:23-cv-05048-SVK<br><br>**MOTION TO INTERVENE**<br><br>Date:       November 14, 2023<br>Time:      10:00 a.m.<br>Crtrm.:    6, 4th Floor<br><br>Judge:  Hon. Judge Susan van Keulen<br>Action filed:    October 2, 2023<br>Trial Date:      Not yet set |

Case No. 5:23-cv-05048-SVK

MOTION TO INTERVENE

## I. INTRODUCTION AND RELIEF REQUESTED

Daniel Friedberg, the former Chief Regulatory Officer and General Counsel of FTX Trading, Ltd.,[1] moves to intervene in this insurance-coverage litigation filed by Plaintiff Samuel Bankman-Fried. Mr. Friedberg, like Mr. Bankman-Fried, is an "insured" under the subject management liability policy issued by Defendant Continental Casualty Company ("CNA"). Mr. Friedberg has been named as a defendant in two civil suits and has incurred costs in the ongoing criminal investigation against Mr. Bankman-Fried and the other perpetrators. Although there is no dispute that the CNA policy covers the costs of mounting Mr. Friedberg's defense against those and any future claims, Mr. Friedberg has not received a single dollar of insurance proceeds. This is in stark contrast to Mr. Bankman-Fried, who has already collected over $5 million and now seeks many millions more from CNA. The sole reason for this inequity is timing: Mr. Bankman-Fried was indicted and sued in 2022, and he immediately began incurring defense costs and receiving insurance money. The suits against Mr. Friedberg came more recently, and his ability to claim under the subject policies was kept from him for months. Mr. Bankman-Fried contends that FTX's insurers must pay defense costs on a first-come, first-served basis, with the result that the fortuity of timing, and not the relative exposure faced by each insured individual, dictates to whom the rapidly eroding coverage limits are to be paid.

Mr. Bankman-Fried is wrong. Under the governing policy language and California insurance law, where multiple insureds present covered claims and the policy limits are insufficient to pay them, the policy proceeds must be equitably allocated among the insureds. Under any conceivable equitable allocation, Mr. Friedberg is entitled to substantial coverage proceeds to fund his defense. Mr. Friedberg thus claims an interest in the insurance at issue in this litigation, and his ability to protect that interest could be impaired or foreclosed if he is not permitted to intervene. Accordingly, under Federal Rule of Civil Procedure 24, Mr. Friedberg is entitled to intervention as of right. The Court should grant this motion and permit Mr. Friedberg to file his Complaint in Intervention, a proposed version of which is filed herewith.

---

[1] Mr. Friedberg was also General Counsel and an officer of other FTX-related companies,.

## II.  STATEMENT OF FACTS

**A.    The Collapse of FTX and Resulting Litigation**

This insurance coverage dispute arises out of the collapse of the various cryptocurrency companies comprising the FTX exchange.  That collapse spawned multiple criminal indictments, the bankruptcy of the U.S. FTX companies, and multiple civil suits against the former senior management of the FTX companies.

Mr. Friedberg has been named as a defendant in two lawsuits.  The first is an adversary action brought by the trustee in bankruptcy, *In re: FTX Trading Ltd, et al.*, Case No. 22-11-068 (U.S.B.C. D. Del).  In that action, the trustee accuses Mr. Friedberg of being at the center of a massive fraudulent scheme.  The second is a class action accusing Mr. Friedberg and others of defrauding customers.  *See Edwin Garrison, et al. v. Sam Bankman-Fried, et al.*, Case No. 22-cv-23753-KMM (U.S.D.C. S.D. Fla.).  Further, while Mr. Friedberg actively cooperated with law enforcement agencies from the moment he learned of the fraud allegedly committed by Mr. Bankman-Fried and others, he continues to be exposed to claims that may arise out of ongoing investigations.

The allegations against Mr. Friedberg are false, and he is prepared to prove the same in court.  But he cannot do so without funds from the management liability policies issued by CNA and the other implicated insurers.

**B.    The Paper Bird Management Liability Policies**

This litigation relates to the separate efforts by Mr. Bankman-Fried, Mr. Friedberg, and other insureds to secure the benefit of the management liability (or "D&O") insurance that the FTX companies purchased.  The subject insurance tower is comprised of a primary policy and three excess layers.  The policies were issued to Paper Bird Inc., a holding company, but it is undisputed that Mr. Friedberg and Mr. Bankman-Fried are insureds under all relevant policies.  At issue here is the unpaid portion of the third excess layer, a $5 million excess policy issued by CNA as Policy No. 652453460 ("CNA Policy").[2]  Dkt. 1, Ex. A (CNA Policy).  The policies provide,

---

[2] Mr. Friedberg contends that at least QBE wrongfully paid coverage proceeds on a first-come,

*inter alia*, defense-cost coverage for the directors and officers of Paper Bird and its subsidiaries. Each policy provides a $5 million coverage limit, and costs of defense erode the limit. Dkt. 1, Ex. B at I (Beazley Policy). As described further below, the first two layers of Paper Bird's tower—Certain Underwriters at Lloyd's of London ("Beazley") Policy No. B0146ERINT2200905 ("Beazley Primary Policy") and QBE Insurance Corporation ("QBE") No. 130003250—paid out a total of $10 million to various insureds on a first-come, first-served basis. CNA proposes to do the same. Decl. of Daniel Friedberg ("Friedberg Decl."), Ex. 1 (2023-07-11 Walsen Ltr.). Friedberg has objected and continues to object to a first-come, first-served distribution scheme.

**C.    Paper Bird's Management Liability Tower and the Allocation Dispute.**

    **1.    The Beazley Primary Policy Paid Out Limits on a First-Come, First-Served Basis.**

Paper Bird first tendered various claims to the primary insurer, Beazley, on August 4, 2022. Beazley reserved rights, asserted coverage positions, and explained that it would pay defense costs of Insured Persons. Friedberg Decl., Ex. 2 (2023-02-06 Zelig Ltr.) at 10. Beazley stated it would work cooperatively with insureds to determine an allocation or, if unsuccessful, reserved its rights to determine a distribution scheme or file interpleader. *Id.* Beazley set forth its allocation plan by letter on March 29, 2023:

> To treat all insureds fairly, Beazley proposes distributing the Policy's proceeds as follows:
>
> - Beazley will pay covered **Policy Costs** ("Covered Costs") on a bi-monthly basis (*i.e.*, every two months).
>
> - Each payment will cover costs incurred during a two-month "Payment Period," beginning with the period running from November 1, 2022 through December 31, 2022, followed by January 1, 2023 through February 28, 2023, and so on.
>
> - For each Payment Period:
>
>   o Covered insureds will be asked to submit all invoices and supporting documents within 30 days of the end of the Payment Period, except for the first two Payment Periods as set forth below.

---

first-served basis, and in doing so acted in violation of California law. He reserves the right to assert claims against QBE and other insurers upon being granted leave to intervene.

- o Beazley will review all invoices, request additional documentation as necessary, and determine the portion that constitutes Covered Costs. We note, in particular, that the following costs are not covered under the Policy:
  - costs solely related to uncovered claims, investigations, or inquiries;
  - costs that are not reasonable; and
  - costs related to insurance coverage advice or recovery efforts.
- o If the submitted Covered Costs for all covered insureds during the Payment Period do not exceed the remaining aggregate policy limit, then Beazley will reimburse the Covered Costs in full.
- o If the submitted Covered Costs for all covered insureds for the Payment Period exceed the remaining aggregate policy limit, then Beazley will pay an equal percentage of each insured's Covered Costs up to the limit. For example, if the remaining aggregate limit is $1,000,000, and three insureds submit invoices for Covered Costs totaling $100,000, $900,000, and $1,000,000, Beazley will pay each insured $50,000, $450,000 and $500,000 respectively, thereby fully exhausting the Policy.

See Decl. of Frank Cordell ("Cordell Decl."), Ex. 3 (2023-03-29 Zelig Ltr.) at 2. In sum, Beazley's distribution scheme proposed to disburse insurance proceeds on a first-come, first-served basis. The letter informed recipients that if Beazley did not receive an objection to the proposed scheme within 14 days it would proceed to pay out the proceeds up to the $5 million policy limit. *Id.*

Among the many issues with the distribution of the Beazley funds was the failure—by both Beazley and Paper Bird—to contact other insureds (such as Mr. Friedberg) to alert them of the planned distribution scheme and their rights under the Policy. Cordell Decl., Ex. 3 (2023-03-29 Zelig Ltr.) (recipients exclude Friedberg and other potential insureds); Friedberg Decl., ¶¶ 7-8. Though Paper Bird was apparently acting as an "agent" for all insured persons under the Policy, the failure to give notice to potential insureds resulted in prejudice to Friedberg as he was not contacted about the distribution plan until *after* all of the Beazley policy proceeds had been paid out.[3]  *See id.* (noting Paper Bird is serving as an agent for individual insureds who had not designated an alternative agent). Consequently, Friedberg was not afforded the opportunity to

---

[3] Paper Bird has since denied that it represents the interests of any individuals currently seeking coverage under the directors and officers liability insurance policies issued to Paper Bird. Cordell Decl., Ex. 4 ¶ 43 (Hiscox Compl.).

object to Beazley's proposed distribution scheme before the $5 million limits were exhausted.[4] Friedberg Decl., ¶ 8.

### 2. QBE Followed Suit and Exhausted its Limits on a First-Come, First-Served Basis, Over Mr. Friedberg's Objections.

The QBE Policy is an excess policy that largely follows form to the Beazley Primary Policy. In anticipation of exhaustion of the Beazley policy limits, counsel for QBE contacted Mr. Friedberg to give notice of QBE's intent to distribute the policy proceeds in the same manner as Beazley had. Friedberg Decl., ¶ 8. QBE asked for Mr. Friedberg's position regarding the proposed distribution scheme. Friedberg Decl., Ex. 5 (2023-06-20 Ahari Ltr.). CNA likewise informed Mr. Friedberg that it intended to pay its limits in accordance with the Beazley distribution plan. *See* Friedberg Decl., Ex. 1 (2023-07-11 Walsen Ltr.). Mr. Friedberg explained that this was the first he had heard of available insurance, and that he needed to find coverage counsel to explain his rights. Friedberg Decl., Ex. 6 (2023-07-17 Friedberg Email). He also objected to the first-come, first-served distribution plan, explaining that he had not yet incurred significant defense costs because he had been unable to secure counsel without the promise of insurance proceeds. *Id.*

Despite Mr. Friedberg's pending objection, QBE informed the various insureds that it (i) had made a single stop-gap payment of $1 million to Bankman-Fried in July 2023; and (ii) intended to pay submitted defense costs in accordance with the Beazley plan if it did not receive objections by August 14, 2023. *See* Friedberg Decl., Ex. 7 (2023-07-28 Ahari Email). Friedberg repeated his objection orally through counsel to QBE and CNA on August 14, 2023. Cordell

---

[4] In addition, Beazley incorrectly concluded that Friedberg was ***not*** an Insured Person under the Policy because he was never an officer or director of a Paper Bird subsidiary. *See* Friedberg Decl., Ex. 2 (2023-02-06 Zelig Ltr.) at 5-6. Friedberg served as General Counsel and then Chief Regulatory Officer of FTX Trading Ltd., a Paper Bird subsidiary. Friedberg Decl., ¶ 1. Thus, Friedberg qualifies as an "Insured Person" under the Beazley Primary Policy and the CNA Policy. *See* Dkt. 1, Ex. B (Beazley Policy) at XIV (defining "Company" as, *inter alia*, the "Parent Company" and "any Subsidiary"); *id.* (defining "Insured Person" as, *inter alia*, "all persons who were, now are, or shall be directors, officers or trustees . . . of the Company and all persons serving in a functionally equivalent role for the Parent Company or any Subsidiary").

Decl., ¶ 2.  On August 31, 2023, Mr. Friedberg's objection was again reduced to writing, this time in a formal letter from coverage counsel, and served on QBE and CNA.  *Id.*, Ex. 8 (2023-08-31 Cordell Ltr.).  That same day, QBE gave notice that it had exhausted its policy limits on a first-come first-served basis.  *Id.*, Ex. 9 (2023-08-31 Resta Email).

### 3. CNA Proposes the Same First-Come, First-Served Distribution Plan.

The $5 million CNA Policy is an excess policy that largely follows form to the Beazley Primary Policy.  Dkt. 1, Ex. A (CNA Policy).  On July 11, 2023, CNA issued a letter advising the then-known insureds that defense costs being claimed would likely exceed its policy limits.  *See* Friedberg Decl., Ex. 1 (2023-07-11 Walsen Ltr.).  CNA initially posited that the Beazley first-come, first-served distribution plan was proper and stated its intent to pay its limits in accordance with that plan once QBE's limits were exhausted.  *See id.*  CNA contended that first-come, first-served distribution was required by the terms of the Beazley Primary Policy, which states that "Underwriters shall advance or pay **Policy Costs** on a current basis but no less than once every sixty (60) days."  *See* Dkt. 1, Ex. B (Beazley Policy) at IV.D.  On September 25, 2023, CNA gave notice that it disbursed a $871,293.54 payment to Mr. Bankman-Fried.  Cordell Decl., Ex. 10 (2023-09-25 Emam Email).  There are thus $4,128,706.46 of limits remaining on the CNA Policy.  *See id.*

### 4. Hiscox Filed an Interpleader Action.

Hiscox provides the final $5 million layer of excess insurance coverage.  Recognizing the obligations imposed by California law on insurers to treat insureds fairly when faced with multiple competing claims to limited insurance proceeds, Hiscox filed an interpleader action on August 9, 2023. *See* Cordell Decl., Ex. 4 (Hiscox Compl.) at ¶ 48 ("Under California law, an excess insurer, with notice of potentially competing claims that exceed policy limits, has an obligation to treat all of its insureds fairly. . . . The obligation to treat all insureds fairly includes the duty to refrain from favoring one insured over another and from impairing any insured's right to benefits.") (citing *Schwartz v. State Farm Fire & Casualty Co.*, 106 Cal. Rptr. 2d 523 (Ct. App. 2001) and *Shell Oil Co. v. National Union Fire Insurance Co.*, 52 Cal. Rptr. 2d 580 (Ct. App. 1996)).  Friedberg and

1  Bankman-Fried are among the various insureds that have been named as defendants in the Hiscox
2  action.  *See id.*

### D. As a Result of the Inequitable First-Come, First-Served Distribution Scheme, Mr. Friedberg Has Yet to Receive *Any* Insurance Proceeds.

Despite being subject to significant civil and impending criminal liability, the first-come, first-served scheme has unfairly favored all other insureds.  Of the 13 insureds who have received portions of the $10 million-plus that has been paid out, three have pled guilty to criminal charges, including fraud.  These insureds collectively received over $2.6 million.  *See* Cordell Decl. Ex. 11 (2023-09-25 Resta Email).  Mr. Bankman-Fried's criminal trial started on October 2, 2023 and is ongoing.  *Id.*, Ex. 10 (2023-09-25 Emam Email).  To date, he has received approximately $5.6 million of the over $10 million that has been paid out from the primary policy and first and second layers, including the "emergency" funding from CNA. *See id.*, Exs. Ex. 10 (2023-09-25 Emam Email) & 12 (2023-09-25 Resta Email).  Mr. Friedberg has received nothing.  Friedberg Decl. ¶ 9.

Mr. Friedberg has faced and faces the following defense costs:

(1)  He was the subject of extensive discovery and has submitted hundreds of responsive documents to the bankruptcy trustee in its discovery under Bankruptcy Rule 2004.

(2)  He has had extensive engagement with law enforcement including:  (a) two in-person interviews with the Department of Justice ("DOJ"), the U.S. Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC") in New York; (b) at least three phone calls with the DOJ, SEC, and the CFTC; (c) two phone calls under oath with Bahamian regulators; (4) written correspondence with Bahamian regulators; and (d) at least two telephone conferences with the FBI.

(3)  He is the subject of the *Garrison* class action and has been unable to hire counsel due to limited funds.

(4)  He has been sued in an extremely complex 10-count complaint by the FTX liquidator.  This action falsely alleges that Mr. Friedberg knew of and facilitated the fraud.
Friedberg Decl., ¶¶ 2-5.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · Fax 415.989.1663

# III. ARGUMENT

**A.  CNA's Proposed First-Come, First-Served Payment of Defense Costs is Disputed and Contrary to the Policy Language and the Governing California Law.**

All parties agree that the total defense costs incurred and expected to be incurred by Mr. Bankman-Fried, Mr. Friedberg, and other insureds exceed what remains of the $5 million limit under the CNA Policy (and indeed will exceed the additional $5 million limit of the Hiscox Policy). Messrs. Friedberg and Bankman-Fried disagree over how and to whom the remaining policy proceeds are to be paid.

Mr. Friedberg contends that the situation at hand triggers California's principles of equitable allocation. These principles require insurers to treat their insureds fairly. *Schwartz v. State Farm Fire & Casualty Co.*, 106 Cal. Rptr. 2d 523 (Ct. App. 2001) (the duty of good faith and fair dealing requires insurers "not to favor the interest of one of its insureds over the interests of the other"); *Shell Oil Co. v. Nat'l Union Fire Ins. Co.*, 52 Cal. Rptr. 2d 580 (Ct. App. 1996) (applying Washington and California law); *Lehto v. Allstate Ins. Co.*, 36 Cal. Rptr. 2d 814 (Ct. App. 1994); *cf. Strauss v. Farmers Ins. Exchange*, 31 Cal. Rptr. 2d 811, 814 (Ct. App. 1994) (explaining insurer's duty extends to all insureds, and acceptance of settlement offer leaving two insureds without coverage would breach covenant of good faith and fair dealing). Specifically, insurers must consider the limited policy proceeds and equitably allocate those proceeds. Failure to do so exposes insurers to liability for bad faith. *See Exec. Risk Specialty Ins. Co. v. Rutter Hobbs & Davidoff Inc.*, 2012 WL 12878754, at *5 (C.D. Cal. Sept. 12, 2012), *aff'd sub nom.*, 564 F. App'x 887 (9th Cir. 2014) (an "insurer may be liable on a claim of bad faith made by other insureds with competing claims if it pays the entire policy limit on behalf of fewer than all insureds").

Mr. Bankman-Fried contends that the policy language requires CNA to pay defense costs on a first-come, first-served basis, without regard to the fairness of that approach as measured by the relative exposure of the competing insureds or the sums that each has received. His argument is based solely on his interpretation of the CNA Policy's "current basis" provision. Dkt. 1, Ex. B (Beazley Policy) at IV.D ("Underwriters shall advance or pay **Policy Costs** on a current basis but

no less than once every sixty (60) days.") (Bold in original) ("Current Basis Provision"); *id.* at XIV ("Costs" include attorneys fees and expenses).[5]

The Court will be called upon to resolve this debate in this action, after Mr. Friedberg has been made a party via intervention. In summary, Mr. Friedberg's response to Mr. Bankman-Fried's position is this: The Current Basis Provision is far too slim a textual reed to trump California's rule of equitable allocation. The Current Basis Provision merely establishes the insurer's fundamental obligation to pay defense costs on an ongoing basis and limits the time that the insurer may take to review and pay such costs. The term is silent as to ***priority of payment where there are competing claims to an insufficient limit***. Under these circumstances, a first-come, first-served distribution scheme—over the objection of an insured otherwise entitled to defense costs—is not equitable or appropriate. *Cf. Exec. Risk Specialty Ins. Co.*, 2012 WL 12878754, at *7 (rejecting argument that California recognizes a "first to settle" rule); *Schwartz*, 106 Cal. Rptr. 2d at 253.

This conclusion is consistent with the view expressed by QBE—the first layer excess carrier—in an unrelated case. There, QBE argued that a similar current basis provision does not address a situation where multiple insureds are competing for insufficient insurance dollars. In *QBE Specialty Ins. Co. v. Kane as Tr. for Hawaii Island Air, Inc.*, No. CV 22-00450 SOM-KJM, 2023 WL 1069703 (D. Haw. Jan. 27, 2023), QBE filed an interpleader action, and therefore bore the burden of establishing "a real and reasonable fear of exposure to doubt liability or the vexation of conflicting claims." *Id.* at *6 (internal quotations and citation omitted). One of the insureds argued that QBE could have no such legitimate fear, because the policy language clearly set forth how the competing claims should be paid. One of the terms the insured cited was this:

> A. …. In any other Claim, the Insurer shall advance Defense Costs on a current basis but no later than 60 days after receipt of the legal bills and any supporting documentation.

---

[5] This provision is part of the CNA Policy by virtue of the fact that the CNA Policy is an excess policy that follows form to the Beazley Primary Policy. Dkt. 1, Ex. A at I (CNA Policy).

*Id.* at *8 (ellipses in original).  QBE responded that this policy language does "***not resolve any substantive right to coverage or address conflicting claims***" when faced with multiple claims for limited defense cost coverage.  *Id.* at *8 (emphasis added).  QBE cited the *Schwartz* line of cases in its briefing, explaining that it had an obligation to treat insureds fairly.  *See* QBE Reply Supp. First Am. Mot. Leave Deposit Interpleader Funds, Case No.1:22-cv-00450-SOM-KJM, Dkt. 22 at 6-7.  The court agreed with QBE and allowed the interpleader to proceed.  *See Kane*, 2023 WL 1069703 at * 13.

  Mr. Bankman-Fried's reliance on the Current Basis Provision is also inconsistent with the only term in the Primary Policy that addresses the priority of payments among competing claims:

> C. Order of Payments
>
> Payments of **Loss** by Underwriters shall reduce the Limit of Liability. Underwriters shall pay **Loss** in the following order:
>
> 1. first, Loss that is allocable to any Wrongful Act committed or any conduct undertaken prior to the Company becoming a debtor in possession under the United States bankruptcy law or similar legal status under foreign law; and
>
> 2. second, Loss that is allocable to any Wrongful Act committed or any conduct undertaken on or after the Company became a debtor in possession under the United States bankruptcy law or similar legal status under foreign law.

Dkt. 1, Ex. B at IV.C (Beazley Policy) (bold in original) ("Order of Payments Provision").  Under this provision, Mr. Friedberg's losses are on equal footing with those of the other insureds because his liability relates to allegedly Wrongful Acts committed "prior to the Company becoming a debtor in possession."

 Mr. Bankman-Fried therefore has no basis to justify his demand of payment based solely on when the insureds submit their defense cost invoices.  There is no requirement—either in the Policy or under California law—that Friedberg win a race with Mr. Bankman-Fried in submitting claims for payment to CNA.  *See Schwartz*, 106 Cal. Rptr. 2d at 253 (noting the "'first-come, first-served' theory of recovery on excess insurance coverage" is based in part on the "dubious" proposition that "there is some merit to awarding insurance benefits to injured parties based on

how fast they can press their claims rather than on the extent of loss or other equitable basis"); *Fed. Ins. Co. v. Tyco Int'l Ltd.*, 871 N.Y.S.2d 9, 10 (App. Div. 2008) ("In equitably distributing the policy proceeds, the court correctly found that the policy gives priority to the claims of 'insured persons' over those of the insured corporation, properly considered the corporation's access to excess coverage, and *properly declined to consider the order in which the insureds submitted their defense bills*.") (emphasis added).  On the contrary, CNA's obligation to pay Friedberg's attorney's fees necessarily includes Defense Costs an insured will have to pay, but that have not yet been billed by defense counsel until a case (or investigation) is completed.

Accordingly, based on the plain language of the CNA Policy and principles of equity, Friedberg should be permitted to intervene and should receive an equitable allocation of the CNA policy.[6]

**B.    This Court Should Permit Friedberg to Intervene in This Action in Order to Protect and Preserve his Right to Defense Cost Coverage from CNA.**

Pursuant to Fed. R. Civ. P. 24, Friedberg moves to intervene as of right (or, alternatively, permissively) so he can protect his right to receive an equitable allocation of the benefits available under the CNA Policy.  Intervention as of right is appropriate when:

> (1) the applicant's motion is timely; (2) the applicant has asserted an interest relating to the property or transaction which is the subject of the action; (3) the applicant is so situated that without intervention the disposition may, as a practical matter, impair or impede its ability to protect that interest; and (4) the applicant's interest is not adequately represented by the existing parties. This test essentially mirrors the language of Fed. R. Civ. P. 24(a)(2). Generally, Rule 24(a)(2) is construed broadly in favor of proposed intervenors and we are guided primarily by practical considerations.

*U.S. ex rel. McGough v. Covington Technologies*, 967 F.2d 1391, 1394 (9th Cir. 1992) (internal citations and quotations omitted). In evaluating motions to intervene, courts must "take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer

---

[6] QBE, the first excess layer, has already exhausted its policy limits by paying out on a first-come, first-served basis.  This conduct exposes QBE to liability for breach of contract and bad faith.  As the facts and legal analysis applicable to both CNA and QBE arise from the same transaction or occurrence and are integrally related, Friedberg reserves his right to add QBE as a defendant if the Court grants Mr. Friedberg intervention in this action.

1  in intervention, and declarations supporting the motion as true." *Sw. Ctr. for Biological Diversity
2  v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

3  As to the first factor—timeliness—"three factors are weighed: (1) the stage of the
4  proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the
5  reason for and length of the delay." *Id.* at 1395. Here, the proceeding is in its fledgling stages.
6  Bankman-Fried filed this lawsuit just last week on October 2, 2023. Friedberg's proposed
7  intervention will not warrant or necessitate any adjustment to the scheduling order. For the same
8  reason, neither Bankman-Fried nor CNA will be prejudiced if Friedberg intervenes. Friedberg's
9  motion, therefore, is timely.

10 The second factor—an interest in the property or transaction—"is a practical, threshold
11 inquiry." *Berg*, 268 F.3d at 818. Friedberg is an "insured" and plainly has an interest in the
12 remaining limits on the CNA Policy. That right has been explicitly recognized by CNA in its
13 letters to Friedberg. *See, e.g.*, Friedberg Decl., Ex. 1 (CNA letter stating informing Friedberg of its
14 plan to pay out its proceeds and requesting confirmation of consent or objection to distribution
15 scheme).

16 The third factor is "impairment of the interest." Where an individual's interest "would be
17 substantially affected in a practical sense by the determination made in an action, he should, as a
18 general rule, be entitled to intervene." *Berg*, 268 F.3d at 822. Friedberg, Bankman-Fried, and
19 CNA all have competing interests in the CNA Policy; if Friedberg is not permitted to intervene,
20 his interest will never be heard.

21 The fourth factor—whether existing parties adequately protect the movant's interests—is
22 readily dispatched. A non-party is adequately represented by existing parties only if:

> (1) the interests of the existing parties are such that they would undoubtedly make all of the non-party's arguments; (2) the existing parties are capable of and willing to make such arguments; and (3) the non-party would offer no necessary element to the proceeding that existing parties would neglect.

*Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1153-54 (9th Cir. 1998). As noted above, Friedberg and Bankman-Fried are both vying for the proceeds of the CNA Policy. Their interests are at odds insofar as Bankman-Fried will not be arguing that Friedberg should receive

any money (indeed, quite the opposite). CNA—knowing its policy proceeds will be exhausted one way or the other—will likewise not be advocating for Friedberg's interests.

If the Court concludes that Mr. Friedberg is not entitled to the intervene as of right, he should be allowed to intervene permissively. Under FRCP 24(b)(1)(B), "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Permissive intervention is appropriate where the moving party "meets three threshold requirements: (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998). All three factors are satisfied here. The Court should thus exercise its discretion and permit Friedberg to intervene.

## IV.  CONCLUSION

The Court should permit Friedberg to intervene in this action, and then find that the CNA Policy, according to its plain meaning and principles of equity, requires that CNA pay Mr. Friedberg a reasonable allocation of his defense costs.

DATED: October 10, 2023                COBLENTZ PATCH DUFFY & BASS LLP

By:     /s/ Benjamin C. Pulliam
BENJAMIN C. PULLIAM
RICHARD R. PATCH
Attorneys for Intervenor Daniel Friedberg

DATED: October 10, 2023                GORDON TILDEN THOMAS & CORDELL LLP

By:     /s/ Franklin D. Cordell
FRANKLIN D. CORDELL
GREG D. PENDLETON
Attorneys for Daniel Friedberg